2016-1038-41. Mr. Krumholz, when you're ready. Thank you, Your Honor. I am from Wisconsin, by the way, and Manitowoc is the way to say it. May it please the Court, I represent Mexichem and with me is my partner Patrick Fleece. We are appealing the ruling of the Patent Trial and Appeal Board that Claim 2 of U.S. Patent 844874 was patentable. They found Claims 1 and 3 through 15 to be unpatentable. Our appeal is pretty narrowly focused simply on what we believe was the clear error of the Board in indicating that there was no teaching of purification to move from 80% to 90% 1, 2, 3, 4 ZE refrigerant, but the they had cited specifically. The Board found Claim 2 patentable not because there was an unexpected result. There were no unexpected results. The Board found Claim 2 patentable because they said going from 80% to 90% was not a result effective variable, i.e. a variable that achieved a recognizable result. Why are they wrong about that? Well, they're wrong about it because the Inigati reference, Embodiment 2, specifically disclosed 1, 2, 3, 4 ZE, which is a refrigerant, an HFC refrigerant, back in 1992 and specifically disclosed it as being used as a refrigerant. The testimony of record clearly indicates that that disclosure in Inigati was a blend of two isomers of 1, 2, 3, 4 ZE, a cis isomer and a trans isomer. So in order to get to the 90%, the trans isomer has to be a result effective variable, right? Yes, and it's being taught to be a result effective variable with lubricants and materials. It's being taught that it's... That particular isomer? Yeah, I mean, you're right about the compound itself, the HFC-1234-ZE, but I don't see in record where at the time the patent was filed that it was known that the trans isomer was particularly desirable. I see what your point is. The prior art, though, was predominantly 80% trans isomer, and the prior art said that if you have 80% trans isomer and you use it in a heat pump, that it's compatible with the lubricants, it's compatible with materials, so it taught that it was predominantly compatible, and going from 80% to 90%, there's nothing in the record that indicates that there was any unexpected result or any critical nature at the 90%. Well, but in addition to showing that there was no unexpected result, you have to show that it's a result effective variable. In other words, that someone would say, well, it's desirable to have more of this trans isomer, but then at the time, that was not known, right? Well, at the time, what was known about the trans isomer was that, and this is what caught us a little bit by surprise because the institution decision and the argument at trial did not focus on purification, but at the time, what was known and what was of record and what was put in the record by Honeywell was a publication from 1996 by Bogdan which specifically said that the trans isomer was purified and found to be not highly toxic or mutagenic. So if the goal was to have a beneficial variable and using the trans isomer, that supplied the necessary teaching, and that was the basis of our appeal saying, look, if you know this material is not toxic and their patent made a big deal out of toxicity of the refrigerant, then it was known before the date of the invention that the pure material was not toxic, not mutagenic, and it was known that the material could be used as a refrigerant, and therefore the impetus to take it from up to 100% was available in the prior art and taught as a result-effective variable within the prior art. Did I respond? Well, if the other isomer were toxic, you wouldn't even use 10% of it, right? Well, if the other isomer were toxic, yes, that would be bad, but I would point out that we are talking about and that all refrigerants are not breathable by human beings, and therefore to the extent that you are in a room and it is filled with any refrigerant, good, bad, or indifferent, if it doesn't have oxygen, you are going to die. And that was discussed at trial, too. But the bottom line here is that there's nothing in any teaching anywhere that teaches against going past the 80% barrier, that this ability with POE lubricants was taught at 5%, 10%, 15%, all the way up to 80%, and there's no surprise once you get past 80% that it still continues to work and be effective as a refrigerant, and the prior art clearly taught that 100% of the trans isomer was not toxic or highly mutagenic at the time, and therefore to move beyond 80% would have been a natural impetus within the art to optimize that refrigerant. I guess what I'm saying seems to me that might be a motivation to move to 100%, but it's not a motivation to move to 90%. Well, the claim says at least 90%, and the only information in their patent where they talk about greater than 90% is with 100% test in Table 1 of their patent where they list what they call the benefits of the cis and trans isomers along with several other refrigerants, and they claim the trans isomer at 100% had better refrigeration characteristics while the cis isomer actually in that table actually has a higher coefficient of performance. So I don't think the information in their patent lays out a solid basis why they even thought going to 100% at the time of the invention was a good idea. We do know that chemists make optimizations all the time for purification purposes, and we do know that if you are aware that you have a material that would be not highly toxic, not mutagenic, and that's known in the prior art, we know that it's taught to be a good refrigerant, but there's a natural impetus then to purify the material. I'm not trying to argue with you, Judge. I guess I am trying to argue with you. You're here to argue, I understand. But I'm trying to hopefully answer your question, and have I answered your question? If not, I can... Okay. So the focus of our argument then is simply that the board did not identify what was going to 90% achieved. I think the board owed us at least an identification of what this critical feature was, because basically what they were saying is we're stepping outside of the general teaching of valor, and we're saying we're going to apply one of the exceptions of valor, which is that 90% had some critical feature attached to it that wasn't recognized in the prior art. And what we're saying is miscibility with lubricants was recognized in the prior art. Its use as a refrigerant was recognized in the prior art. Its non-toxicity of the pure material was recognized in the prior art. So we don't know from the board's decision what wasn't recognized in the prior art that the board is talking about that gets you to 90% somehow and makes this a patentable item. Simply saying, oh look, the prior art teaches 1 to 80%. I'm going to claim 90% when you have a very close relationship and you're achieving all the features of the 80% refrigerant and goals. And you make this optimization. There's no significant increase anywhere in this record that shows why 90% is any more significant or better or critical than 80%. Did I answer your question? Do you have more questions? Apparently not. We'll save the rest of your time. I shall. Thank you very much. Mr. Locascio, you have a cross appeal, and you want to save four minutes for that. Yes, Your Honor. Thank you. May it please the court, Craig Locascio for Honeywell. Let's start with claim two. Substantial evidence supports the board's finding. Mexichem failed to meet its burden, and what we just heard was the board owed us more or Honeywell didn't identify any criticality. Mexichem here had the burden, and on a factual issue with substantial evidence, the board said, you have not demonstrated any reason anyone of skill in the art would purify the trans isomer versus the cis isomer of 1234-ZE at all. Indeed, Mexichem argues in the direct contrary face of a critical dispositive fact that Judge Dyke identified. Nowhere in the prior at all until the 874 disclosure did anyone ever talk about the performance differences between trans and cis. And table one, despite the argument we just heard, table one of the patent specifically identifies that the trans isomer was found by Honeywell to have two times the refrigeration capacity of the cis isomer. That's nowhere in the art. And then the idea that Inagaki sort of gets you there, no one until Honeywell also disclosed in the 874 the two boiling points of cis and trans isomers. Did anyone even know what the ratio in Inagaki was? And on that basis, the board decided that for the claims that were outside of the range of the Inagaki disclosure, back calculating it at 80-20 trans and cis, there was no basis for anyone to purify trans or to focus on trans, which claim two certainly does. With respect to Bogdan, you argue that they can't make any arguments based on Bogdan because it wasn't a ground, a prior art ground for institution. But is it true that it was Honeywell that offered Bogdan into the record? Honeywell attached provided the Bogdan reference. The Bogdan reference does nowhere near get where Mexikam says it does. It is indeed never argued and waived, first off. Well, it doesn't have to be a piece of prior art to be a piece of evidence that the board could look to to determine what the prior art taught. I agree, Your Honor. The board could have looked to it. The board did not, and so at best under that theory, I guess we'd be with a remand on that for the board to decide it. But we don't have to get there, and there's a couple reasons. The Bogdan reference is about an entirely different chemical, 245FA, and it's a blowing agent. And Bogdan says there are off gases that come with that, and one of them is 1234ZE. And in the Bogdan reference at A1184, there is a passing reference that says these are decomposition products. 1234ZE is one of those. And it says we're going to test them both. It says the trans is non-toxic and the other one hasn't been tested, right? It says cis has not been tested. So on the critical issue of is it a comparison saying trans is good, cis is bad, no. And while the brief says non-toxic, it says limited testing, the limited amount of data available on trans implies it's not highly toxic or mutagenic. It's a far cry from non-toxic to be sure. But that's not a discussion of the capacity difference, the benefits of trans versus cis at all. It's essentially saying there's this off gas product. It has two isomers, and we're going to test them both for toxicity. And the reason, frankly, your honor, that that was in the record at all was not having anything to do with this issue but because we'll get to a second to the cross appeal. This entire class of what are called HFOs, unsaturated hydrofluorocarbons. They were never used ever by anyone until Honeywell as a refrigerant because they were thought to have a whole host of problems, one of which was toxicity. And they were viewed as impurities to be avoided, things that we wouldn't want to have around in any refrigeration system. Bogdan's relevance and why Bogdan was in the record at all was to show that even when it was an off gas parts per million, there were still concerns about its toxicity, your honor. I'm not quite clear what you said. Inagaki taught the use of HFO 1234ZE as a refrigerant, right? Inagaki identified 30 different potential refrigerants. Inagaki certainly discloses 1234ZE in its example too, your honor, as what's been back calculated in the 80-20 mix. Inagaki was abandoned and no one in the history of the time from Inagaki until the time of Honeywell's patents here ever used an unsaturated HFC or as it's also known HFO as a commercial refrigerant. That may be true but that's not the test. I mean Inagaki is prior art that taught the use of this compound as a refrigerant, right? Inagaki is prior art that this particular compound can be a refrigerant. The claim here isn't to the composition, your honor. The claims here, if I can pivot to – Well, yeah, I understand the other issue about the combination with the lubricant. That's a different issue. It is, your honor. And on that issue, unless there's other questions around claim two, let me pivot to Honeywell's cross appeal here because Mexichem's expert on claim two uses the 874 patent as a roadmap to go figure out why you want transverse assist. The board said you can't do that and claim two was found patentable. On the remaining claims, what the board then did is essentially use the same thing, say let's look at 874 as a roadmap. And the board's failings on those claims are twofold. First, the board doesn't provide any motivation to combine and Mexichem didn't identify any motivation to combine. At best, their expert, their own employee, Dr. Kaur, says it's obvious to try to combine. Your own patent refers to the POE lubricants as commonly used lubricants, right? Correct. They're a series, a class of lubricants that can be used. They're a class of refrigerants, thousands of combinations that can be tested. The board's decision is premised on the idea based on a passing reference in Bivens that all POEs – or pardon me, all HFCs would be usable with a POE. And that ignores the record – the evidence in the record. What happened here – and there was arguments around this and the board is where it is. The board's determination was as a matter of semantics and the acronym. An HFO is within the universe of an HFC. It is a hydrofluorocarbon. True enough. That doesn't end the inquiry. And frankly, we think if you look at the board's decision, that's the wrong inquiry. What the board ignored is the board didn't look to whether when you read Bogdan – because it's an obviousness rejection. It's premised on Bogdan – pardon me, Bivens. It's a rejection on Bivens. It's premised on Bivens. The board's analysis is Bivens says you can use a POE as a lubricant with an HFC, and it's commercially used that way. That's true. But what's true about it, and Bivens himself testified to, is the only HFCs ever commercially used up until the point of that work were unsaturated HFCs. Meaning they had no double bonds, and so they were less reactive, less toxic. And the result of those, though, is they caused – they had high global warming potential. So that's why when Honeywell came up with the HFO class, 1234ZE, 1234YF, those were the first commercial uses of HFOs. And for a decade between Inagaki's disclosure and the disclosure in the 874, the art routinely talked about how these were viewed as being unstable with various things, including lubricants. POE being identified as an unstable lubricant by Bivens himself. And Bivens says one of skill in the art would not have viewed that definition of an HFC refrigeration system, which is actually the language of Bivens, as including the unsaturated – pardon me, the saturated class of HFOs. But isn't – I mean I understand you think that – you claim that there might have been a clerical error or something in the patent. But isn't it problematic that your patent itself defines these things much more broadly? I'm not arguing and relying on the idea that – whether it's a clerical error or not. The fact that as a technical matter, an HFC, anything that has hydrogen, fluorine, and carbon, includes the class of HFOs is not the argument, Your Honor. The point is the patent itself, when it talks about these and talks about them – even if it does talk about them, most times it says HFOs. But when it talks about them as HFCs, one who reads the 874 patent still knows from various points I can direct the court to these are unsaturated, double-bond compounds. That's the disclosure of the formula. That's the discussion of every one of those compounds. And that as a class, whether we call it unsaturated HFCs or whether we call it HFOs, it doesn't make a difference. And so the semantics is I think where the board got on the wrong path, and the right question has to be under this court's law. What would one of skill and the art, when they read Bivens, think that to mean? The board said it means every single thing that is an HFC, including the HFO class that no one had used and people said don't use, would be compatible with PLE lubricant. The evidence in the record are two different HFCs that were in existence at the time, 134A and 143A. One of them is compatible with PLE. One of them is not. So this concept that the board based its whole determination on around Bivens, that all HFCs are compatible with PLE, is factually incorrect on the record. And the evidence around the HFOs, that's the Thomas Declaration, specifically says that example one of inigaki, not compatible with a PLE. That's an HFO as well. Example is 1243. 1234, example two, is. And so that was an unexpected result as well, and the board washed right over that. At base, the core of the board's failings and why we think this, on the claims other than claim two, should be reversed, at a minimum remanded, is the board never took any of this. These secondary considerations here are extraordinary. For a decade, the world, every chemistry company and every government agency, was looking for something that wasn't just low ozone depletion. That's the HFC class, but low global warming potential. The prior product, 134A, has a global warming equivalent in the thousands. This class, the HFOs first used here. What's the secondary consideration evidence about the combination of this compound with the PLE? With the PLE. Inherent in that discussion I was just going through is its use as a refrigerant. Obviously it needs to be used with a lubricant. And the secondary considerations evidence, Your Honor, goes to that it was known to be unstable. The HFOs were known to be reactive. They were expected to be toxic, and so you wouldn't use them in the system. And if you were going to use them, you wouldn't. Why did your patent say they were commonly used if they were so toxic? I'm talking about now the refrigerant part, Your Honor. Now the lubricants, which I think is where Your Honor was… The patent taught that this is a refrigerant. I don't understand it. The patent doesn't teach that this class of HFOs was previously used as a refrigerant, Your Honor, because it was not commercially used. Inagaki doesn't make any difference whether it's commercially used. That's not the test for obviousness. Commercial use is not the test. I understand, but from the time of Inagaki, all the evidence around secondary considerations, which is why we got here, is around this particular class would not be used in a refrigeration system with a lubricant, particularly one that all the evidence here is reactive, and in Bivens itself. It talks about the risk of polymerization. It talks about the risk of sludges forming, and this combination the board doesn't even discuss. If the board went through the secondary considerations, as Your Honor has started to ask about, that might be one thing. Here the board failed entirely. There's not a single mention of this in the board's decision, nor is there any reference at all to the motivation to combine, and indeed here with a decade between it, indeed the secondary considerations undermine the motivation to combine in the first place. Unless there are other questions, Your Honor, I'll reserve the room. We will hold it for you. Thank you. Mr. Krumholz has almost six minutes. I don't think I'll need all six. He said using all six minutes probably. Let me just start in response here. First of all, with respect to the argument on Claim 2 regarding Table 1, they say Table 1 shows that ZE was the superior refrigerant. All you have to do is look at, this is at A234, all you have to do is look at that table and note that it says the CIS 1, 2, 3, 4 ZE had the lowest discharge temperature out of all those. It had the highest relative COP, which is the coefficient of performance, and their own patent says the coefficient of performance is a universally accepted measure of refrigerant performance. So this table does not establish the trans 1, 2, 3, 4 ZE pure would have been the preferred refrigerant, and it cannot be relied upon for that fact. Going back to this argument on HFC and so on and HFO, this was the whole argument from the beginning. They tried very hard to argue that HFOs were a completely different thing from HFCs, totally disregarding the fact that that is precisely how they refer to them in their own patent as HFCs, and how they continually refer to them, for example, at the bottom of Column 1 of their patent. They specifically noted that in talking about flammability, they specifically state in two sentences, excuse me, it's the bottom of Column 2, that unfortunately many HFCs, which might otherwise be desirable for use in refrigerant compositions, are not non-flammable. For example, floral alkane, difloral ethane, HFC 152A, and floral alkane 111 trifloral propene HFO 1243 ZF are each flammable and therefore not viable for use in many applications. So they classified both an HFO and an HFC under the heading of HFC. All HFC stands for is a material that's made of hydrogen, fluorine, and carbon. All CFC stands for is a material that's made of chlorine, fluorine, and carbon. It's the molecules that matter when you're picking the lubricants, and the point is well taken. If POEs were that poisonous and terrible, no one would have used them. Instead they lay out that this is one of the most commonly used lubricants available. POEs are an interesting lubricant because whereas CFCs work with mineral oils and HFCs do not, and that is of record, POEs are a near universal sort of lubricant. And yes, there was one refrigerant, 143A, that was shown not to be miscible in several temperature ranges with POE lubricants. But every other case that was found found that POE lubricants worked with HFC lubricants. The testimony from Bivens himself was pretty powerful, was it not? I mean, Bivens said that his patent was not meant to refer to HFOs, and he said that one of Skilny Art would not have understood the reference to HFCs to encompass unsaturated HFCs. How is that not pretty damning with respect to your contention that Bivens is part of the teaching that we should look to? Well, I think you have to look at Bivens before the invention and Bivens after the invention. And his testimony before the invention, he made a statement that said, a blanket statement that said HFCs work with POEs and PAG lubricants, and that's the direction that you would go. POEs are commonly used lubricants. That's what the patent states. That's what all the prior art taught. And when you pull it off the shelf, what are you looking at? You're looking at a lubricant that works with hydrogen, fluorine, and carbon. Now, several years later, 10 years later, 15 years later, he wants to recant the position that he stated before the date of invention. That, I think, is suspect testimony. And that is testimony that I don't think is persuasive. And as the finder of fact, PTAB properly weighed that evidence, came to the logical conclusion, and on the substantial evidence, a reasonable mind could find in a way that what Dr. Bivens said in his patent would have more awareness. But Dr. Kaur, your own expert, actually said that it was well known that they were more reactive, right? He said that the POEs, yes, they're reactive in the sense that when he was discussing reactivity, yes, they're hydroscopic. You need to put a lid on your can when you're done using it so it doesn't absorb water from the atmosphere, yes. But the fact that they're more reactive, they're not explosive. I mean, you know, Judge, HFCs, alkanes, 134A is an alkane, okay? They're very stable. They're used in medical dose inhalers. My son uses a medical dose inhaler for his asthma. They're not reactive. What people started to look for and what is of record in this case is for things that would break down quickly in the atmosphere. And that was driven by regulation under the Montreal Protocol moving forward under the Kyoto Accords moving forward worldwide. So while 134A is stable, it works very well, it's a superior refrigerant because it has great versatility because it can be used in medical dose inhalers, it can be used in automobiles. It is being replaced by something that has less versatility, 1,2,3,4-ZE and 1,2,3,4-YF. Why? Because it will break down quickly in the atmosphere. And that was the goal there. And there was a ready-made off-the-shelf solution in Inagaki where the reactivity of that material and the refrigeration performance and compatibility with lubricants and compatibility with materials was all taught by that reference. And I'm past my time. Thank you, Mr. Cromwell. Thank you very much for your time. And I don't think there was anything directed to the cross-appeal, so we'll conclude that, Mr. Locascio. All due respect, Your Honor, the whole discussion... I think he was talking about the main appeal. That's our appeal. The whole discussion I just had with him was on the cross-appeal. All right. I apologize, Your Honor, if I was... Thank you. And I just have a couple of points. One is the rejection is tied to an obviousness combination with Bivens. The only reference at all to the POE in Bivens is a line about using it in the HFC refrigeration system. Bivens' testimony, as he's not a Honeywell employee, he was at DuPont at the time, he says the only commercial refrigeration systems we were talking about, because the only ones that existed, were not this class of unsaturated HFOs. And on that point, Korr is the only response to that, and the board seems to have credited Korr in his obvious to try argument. Korr's entire declaration is written from the present tense. Korr never says anything about 2002. He never says anything about the time of the invention. And that's a critical failing here because this goes to did people at the time believe POE would work with an HFO in the record? The only evidence in the record is that, in fact, it does not work with them all. The Thomas Declaration specifically compares example 1 and 2 of Inigaki with POE. And example 2 is, in fact, workable. It's missable, and it's compatible with POE. Example 1, which would also be under the board's same analysis, compatible and known to everyone to be workable with POE, is, in fact, not. And in the face of that, and in absence of any analysis of the motivation to combine, or any discussion at all of the secondary considerations here, we respectfully suggest that claim 2 should be affirmed, but the remainder of these claims should be reversed by this court or at a minimum remained. Any other questions? I'll address them, but otherwise I'll leave the remainder. Thank you. Counsel will take the case under advisement.